Jason Kuller, NV Bar No. 12244
Rachel Mariner, NV Bar No. 16728
Shay Digenen, NV Bar No. 16397
**RAFII & ASSOCIATES, P.C.**
1120 N. Town Center Dr., Ste. 130
Las Vegas, Nevada 89144
Phone: 725.245.6056
Fax: 725.220.1802
jason@rafiilaw.com
rachel@rafiilaw.com
shay@rafiilaw.com
*Attorneys for Plaintiffs*



## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| CHRISTINA CANTU and REBEKAH SVINNING, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br>v.<br>THOMPSON MICHIE ASSOCIATES, LLC, a foreign limited liability company; TM EQUITIES INC., f/k/a THOMPSON MICHIE ASSOCIATES, INC., a foreign corporation; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No. 2:24-CV-00908-APG-DJA<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT TM EQUITIES INC.'S MOTION TO DISMISS PURSUANT TO FRCP 12(b)(2) AND 12(b)(6); ALTERNATIVE MOTION FOR STAY PENDING JURISDICTIONAL DISCOVERY** |

Plaintiffs Christina Cantu and Rebekah Svinning, on behalf of themselves and all others similarly situated (collectively "Plaintiffs"), by and through their counsel Rafii & Associates, P.C., hereby oppose the motion to dismiss Plaintiffs' Complaint ("Motion to Dismiss" or "Motion") filed by Defendant TM Equities Inc. ("TM Equities," "TME," or Defendant"). Strictly in the alternative, because Defendant's Motion relies on extrinsic evidence that is contradicted, Plaintiffs request a stay pending further jurisdictional discovery pursuant.

## I.

## SUMMARY OF OPPOSITION

TM Equities is not some hapless unsophisticated player being unfairly dragged into out-of-state court merely for putting its widgets in the stream of interstate commerce. TM Equities is two business partners and

1

their sons who share an office and a vision and a unified business empire, a substantial portion of which is in Nevada.[1]  Together they have targeted Nevada citizens as their renters and Nevada citizens as their employees and together they have been providing managed apartment building in Nevada for over 25 years.[2]  It is not in any way inequitable for this Court to exercise jurisdiction over TM Equities.

Plaintiffs submit that the District of Nevada easily has specific, general, and alter ego or agency jurisdiction over TM Equities Inc. (f/k/a Thompson Michie Associates Inc.), an entity that is linked to Thompson Michie Associates, LLC by name, history, blood, bricks and mortar. It appears TM Equities and Thompson Michie Associates are blurred into a singular entity known as "Thompson Michie" by themselves and others. That singular entity Thompson Michie is directly involved in the management of four large apartment complexes in Henderson and Las Vegas, and TM Equities itself is listed as manager or officer of six active apartment properties in Nevada.[3]

Roger H. Thompson, the "T" in TM Equities and the original "Thompson" in Thompson Michie Associates, LLC, submits a two-page declaration riddled with disputed fact issues that must be resolved in Plaintiffs' favor.  Strictly in the alternative, the factual disputes about TM Equities' involvement with Nevada must be subject to jurisdictional discovery. TM Equities' other peripheral challenges to the Complaint under 12(b)(6) are meritless.  Accordingly, TM Equities' Motion to Dismiss must be denied in its entirety.

## II.

## FACTUAL BACKGROUND

Two business partners, James R. Michie and Roger H. Thompson, have been acquiring property together since 1973.  In a missing narrative that used to be on www.tmequities.com,[4] Mr. Michie and Mr. Thompson show that in their minds there is no meaningful distinction between TM Equities and Thompson

---

[1] *See* Declaration of Rachel Mariner ("Mariner Dec.") filed concurrently herewith at ¶¶ 19, 20, 21, 24, 25, 28 and Exs. L, M, N, Q, R, & U (showing incestuous, nepotistic relationship among Roger H. Thompson, James Michie, R. Eric Thompson (aka Roger *E.* Thompson), and Trent Michie as mix-and-match managers and officers in various Thompson Michie enterprises, including TM Equities Inc. and Thompson Michie Associates, LLC.)

[2] *See id*. at ¶¶ 22-23 and Exs. O & P (showing filing history of Thompson Michie Associates, Inc. dating back to 1998, before changing its name to TM Equities, Inc. in 2005 and creating Thompson Michie Associates, LLC that same year.

[3] *See id.* at ¶ 21 & Ex. N.

[4] *See id*. at ¶¶ 4-8 and Exs. A-C (finding missing "Who We Are," Mission," and "Portfolio" pages).

Michie Associates. It is their lives' work and their family:

> TM Equities Inc. was formed in 1973 as Thompson Michie Associates, Inc. ("TMA") by Roger H. Thompson and James R. Michie. It was formed for the purpose of managing and developing various forms of real estate… TMA's experience included management of commercial and residential properties in Utah, Arizona, Colorado, Pennsylvania, **Nevada**, New Mexico and Texas.

*See* Mariner Dec. at ¶ 6 (emphasis added). The first sentence here is the last sentence that the Court need consider: uniformity and continuity.

TM Equities is a continuation of Thompson Michie Associates, just as Thompson Michie Associates is a continuation of TM Equities. As one article recently put it:

> "After practicing law for a few years, [Roger H.] Thompson partnered with his friend Jim Michie in 1973 to create a real estate partnership called TM Equities…Although Thompson is semi-retired now ***and his son and partner's son run TM Equities' day-to-day affairs***, he says he will probably never fully retire."

*See id*. at ¶ 20 and Ex. M (alteration, ellipsis, and emphasis added).

This narrative does not say that they (or their sons) somehow became separated from the heart of the family business. It does not say that they stopped actively managing multi-family properties in Nevada and took a new path. Rather, a fair inference is that TM Equities are Mr. Thompson and Mr. Michie and they have provided a "legacy of property management" to their sons. Mr. Thompson's Declaration gives no reason to believe that the real estate that TM Equities manages and develops is different from the properties listed on www.thompsonmichie.com : one in Arizona, one in Colorado, one in New Mexico, six in Utah and four in Henderson/Las Vegas: Aviary, Crescent Ridge, La Vie and Castille.[5]

James R. Michie and Roger H. Thompson eventually made their sons, Trent S. Michie and Roger E. Thompson, directors of Thompson Michie Associates LLC. *See* Exhibit 3 to Motion to Dismiss. TM Equities' Motion pretends that it has not even heard of these guys Roger E. Thompson and Trent S. Michie even though they are the elder Thompson and Michie's own sons. *See* Motion at 4 ("TMA ***appears to be*** managed by its managing members, Trent S. Michie and Roger E. Thompson." (emphasis added)). Indeed, Trent S. and Roger E. are themselves principals of TM Equities along with James R. and Roger H. *See* Mariner Dec. at ¶ 19 &

---

[5] The Aviary seems to be missing from www.thompsonmichie.com's list of properties in Nevada but is included in an apartment.com search for Thompson Michie Community and is listed on TM Equities' financing partner's website. *See* Mariner Dec. at ¶ 18 & Ex. K; *see also id*. at ¶ 25 and Ex. R (Nevada entity information for The Aviary at Union Village LLC, showing active involvement of James Michie and Roger *E*. Thompson).

Ex. L.)  Not only do Messrs. Michie and Thompson share an office in Utah with their sons, but TM Equities and Thompson Michie Associates share the same exact corporate address and suite number.  *See* Exhibits 2 and 3 to TM Equities' Motion.

In his declaration, Mr. Thompson states that TM Equities "does not solicit or engage in business in Nevada" and that TM Equities "does not own property in Nevada."  Thompson Dec. at ¶¶ 5 and 8.  As recently as February 1, 2022, however, the website Multifamily.Today announced:

> The Wolff Co. has sold The Aviary, a 360-unit multifamily property in Henderson, Nev., **to TM Equities** for $151 million, records filed with Clark County indicate. The buyer, based in Salt Lake City, financed the purchase with an acquisition loan from a lender affiliated with AIG Asset Management.

*See* Mariner Dec. at ¶ 17 & Ex. J (emphasis added).  Further, on May 11, 2018, the Las Vegas Review-Journal reported:

> Salt Lake City investment firm **TM Equities recently bought the Castile** apartment complex in Henderson for $99.6 million, more than five years after buying a rental complex up the road for $30 million, property records show… **TM Equities owns other apartment complexes in Henderson,** property records show, including Adobe Ranch. The 234-unit complex at 1350 Kelso Dunes Ave., near the corner of Stephanie and Warm Springs Road, was built in 2003 and sits about 2 miles north of Castile.

Mariner Dec. at ¶ 14 & Ex. G (emphasis added).  Perhaps Roger H. Thompson, himself a lawyer, is hyper-focused on legal technicalities and perhaps TM Equities owns those properties through a special purpose vehicle or a financing partner or other legal fiction, but one must admit in the face of disinterested journalism, the reality to the people of Nevada, to Plaintiffs, and the class and collective members they seek to represent, is that TM Equities owns the property and runs the show for the Thompson Michie Communities.

TM Equities, not Thompson Michie Associates LLC, markets itself as an experienced, detail-oriented management company, active in managing the bottom line. In its narrative on www.tmequities.com (*see* Mariner Dec. ¶ 6) TM Equities says it has "unique expertise in increasing equity values through sophisticated procedures and in the application of value-added techniques" and "TMA insists that its properties are neat and clean and present the best 'curb appeal' possible" *Id.*  Directly applicable to Ms. Svinning's and Ms. Cantu's experience of non-payment of wages, TM Equities states outright that its **"goal in almost all instances is to find ways to increase the rental rates, net operating income, the net rentable area, or a possible change of use."** *Id.*  Again, this does not sound like a remote, passive owner, but an entity with active interest in increasing net operating income with active management. The oversight of TM Equities over Thompson Michie is also

4

**OPPOSITION TO DEFENDANT TME'S MOTION TO DISMISS PURSUANT TO FRCP 12(B)(2) & 12(B)(6)**

confirmed: "Thomson Michie Associates LLC continues to carry on the legacy of property management excellence *developed by Roger Thompson and Jim Michie." Id.*

Another data aggregating website, www.prequin.com describes TM Equities:

> TM Equities (formerly known as Thompson Michie Associates) is a US-based real estate firm, specializing in the acquisition, development, rehabilitation management and real estate assets**.** Established in 1973, the firm focuses on opportunities in multi-family, industrial and office properties across the US with a primary focus in the intermountain region.

Mariner Dec. at ¶ 9.  Twice, by itself and by a data aggregator, TM Equities is described as part of the whole operation of its affiliates and subsidiaries, indistinguishable from the current Thompson Michie Associates LLC, and continuing the work of Thompson Michie Associates specializing in "multi-family … properties … with a primary focus in the intermountain region." *Id*.  At some point it appears that TM Equities and Thompson Michie Associates LLC brought in a financing partner, Sentry Real Estate ("Sentry").  Sentry's website states that it "currently owns 12 properties in four states (all but two of which were acquired with our property management and equity partner Thompson Michie)."[6]

It appears that Thompson Michie – meaning both defendants – is considered one unified entity by its financing partner. The only other possible conclusion is that Sentry can't tell the difference between "Thompson Michie," Thompson Michie Associates LLC, and TM Equities. This in itself raises discovery issues: Which one is the equity partner? Which one is managing? Does TM Equities have a property management contract with Sentry?  Or does Thompson Michie Associates LLC?  How could Thompson Michie LLC get a management contract with Sentry without the involvement and oversight of TM Equities?  It is likely Sentry means that these affiliated companies are all part of the same integrated enterprise.  If its finance partner thinks of TM Equities and Thompson Michie Associates as alter egos, surely this Court can as well.

Ultimately, it is difficult to align Roger H. Thompson's Declaration that "TME does not solicit or engage in business in Nevada … TME does not control or manage Defendant Thompson Michie Associates LLC … TME does not own property in Nevada" (¶¶ 5, 8, 14) with the narrative on multiple publicly available websites.  *See generally* Mariner Dec. ¶¶ 4-29 & Exs. A-V.  Regardless, any conflict must be resolved in Plaintiffs' favor.

/ / /

---

[6] Mariner Dec. at ¶ 18 & Ex. K.

## III.

## LEGAL STANDARD

**A.     Conflicts Regarding Personal Jurisdiction Must Be Resolved in Plaintiffs' Favor.**

A two-part analysis governs whether a court retains personal jurisdiction over a nonresident defendant. "First, the exercise of jurisdiction must satisfy the requirements of the applicable state long-arm statute." *Chan v. Soc'y Expeditions*, 39 F.3d 1398, 1404 (9th Cir. 1994). Since Nevada's long-arm statute, NRS 14.065, reaches the limits of due process set by the United States Constitution, the second part of the analysis is whether the exercise of jurisdiction comports with federal due process. *Chan*, 39 F.3d at 1404-05. "Due process requires that nonresident defendants have certain minimum contacts with the forum state so that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice." *Id.* (citing *Int'l Shoe v. Washington*, 326 U.S. 310, 316 (1945)). Courts analyze this constitutional question with reference to two forms of personal jurisdiction: general and specific jurisdiction. *See Castleman v. Crowley*, 3:21-cv-00523-MMD-VPC, at *4 (D. Nev. Mar. 31, 2022)

Where, as here, a motion to dismiss for lack of jurisdiction is based on written materials rather than an evidentiary hearing, "the plaintiff need only make a prima facie showing of jurisdictional facts." *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990). In such cases, "we only inquire into whether [the plaintiff's] pleadings and affidavits make a prima facie showing of personal jurisdiction." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797 (9th Cir. 2004). Conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor. *Id.* (citing *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000) ("Because the prima facie jurisdictional analysis requires us to accept the plaintiff's allegations as true, we must adopt [the plaintiff's] version of events for purposes of this appeal.")).

Recently, a panel of the Ninth Circuit reminded district courts that "personal jurisdiction is a 'fact-intensive' inquiry," and that "the nature and structure of a defendant's business can affect the personal jurisdiction analysis." *See Briskin v. Shopify, Inc.*, 87 F.4th 404 (9th Cir. 2023). For this reason, a court "ordinarily" should grant jurisdictional discovery "where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Laub v. United States Dep't of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003).

/ / /



## IV.

## LEGAL ARGUMENT

### A. This Court has General Jurisdiction Over TM Equities

Practically all the authorities cited by TM Equities are obsolete – or at least entitled to less deference – after the Supreme Court's landmark decision in *Mallory v. Norfolk Southern Ry. Co.*, 143 S. Ct. 2028 (2023). In *Mallory*, decided just last year, the Supreme Court held that business registration may subject out-of-state companies to general personal jurisdiction. *Id.* at 2030-31. In so doing, *Mallory* upended years of contrary precedent holding that, as a general rule, business registration was insufficient to establish general jurisdiction. Even based on the pre-*Mallory* authorities relied on by TM Equities' Motion, TME still admits that being "licensed to do business in the state" is one of the key factors in determining whether general jurisdiction exists. *See* Motion at 8. TM Equities' Motion ignores *Mallory*.

In *Mallory*, the Supreme Court concluded that it did not violate due process for a Pennsylvania court to exercise jurisdiction over an asbestos case with no connection to Pennsylvania other than the defendant's registration under Pennsylvania's foreign corporation registration statute. 143 S. Ct. at 2030-31. Here, of course, there are plenty of connections between TM Equities and the State of Nevada, either on its own or by and through its agent/alter ego Thompson Michie Associates, LLC.

In Nevada, before commencing or doing any business, NRS 80.010 requires a foreign corporation like TM Equities to file with the Secretary of State, among other things, a Qualification to do Business in Nevada form. It therefore begs the question why TM Equities would register and qualify to do business in Nevada for the past 25 years if it is, in fact, conducting no business here. That question becomes even more pointed since NRS 80.015 sets forth a long list of activities, such as maintaining bank accounts, that TM Equities ***could do*** without constituting "doing business" in Nevada. *See* NRS 80.015.

In addition, and rather uniquely, NRS Chapter 76 imposes a separate business license requirement on corporations "conducting" business in Nevada. *See* NRS 76.100. Unlike Chapter 80 that specifies what does not constitute "doing business," Chapter 76 specifies the activities that do constitute "conducting business." Of particular relevance here is ***having a registered agent in the state***. *See* NRS 76.100(7)(a)(3). This makes sense, of course, since why else have an in-state registered agent if not to receive service of process? According to TM Equities own evidence, it has a registered agent in Nevada. *See* Exhibit 2 to Motion. Ergo, TM Equities

is deemed to be "conducting business" in Nevada as a matter of law. And since Nevada's long-arm statute (NRS 14.065) extends to the furthest reaches of due process set up by the United States Constitution – which now includes *Mallory* – TM Equities is subject to the personal jurisdiction of Nevada Courts. *See Knudsen v. Queenstake Resources U.S.A., Inc.*, 2010 WL 11571247, at *4 (D. Nev. May 24, 2010) (holding well before *Mallory* that the defendant "consented to personal jurisdiction in Nevada by registering to do business").

As mentioned, this is not a case like Mallory where the defendant had no connection with the forum state other than foreign registration. In this case, TM Equities is involved in the ownership and management of four apartment buildings in Las Vegas – so-called "Thompson Michie Communities" – including the La Vie "Community" where Plaintiffs worked. *See* Mariner Dec. at ¶¶ 3-10, 21 & Exs. N, O & Q. TM Equities' own financing partner Sentry Real Estate does not distinguish between TM Equities and Thompson Michie Associates LLC. *See id* at ¶ 18 & Ex. K. TM Equities considers itself the successor in interest to all of Thompson Michie Associates and prides itself on its hands-on management and cost-cutting techniques. *Id*. at ¶ 6. The website www.thompsonmichie.com doesn't distinguish between Thompson Michie Associates Inc., Thompson Michie Associates LLC and TM Equities. It could easily be all three. *Id.* at ¶ 10.[7]

Under these facts, TM Equities has "activities within [the] state that are substantial or continuous and systematic" which permit general jurisdiction under the test cited by Defendant. Motion at 7. TM Equities has profited from targeted activity in Nevada, the same people have closely managed land and buildings for profit in Nevada that TM Equities purchased where Nevada residents live and work and are paid or not paid by the single enterprise Thompson Michie. An income stream coming from Nevada based on investment, ownership, and active management of property in Nevada is an appropriate basis upon which TM Equities can and should be haled into court in Nevada. It would only be unreasonable if they were not. Indeed, the real issue here is not whether TM Equities is subject to the Court's jurisdiction, but whether Plaintiffs should also sue principals Roger H. Thompson, Roger E. Thompson, James R. Michie, and Trent S. Michie, as well as the sham investment vehicle, La Vie, LLC, where Plaintiffs were employed. *See* Mariner Dec. at ¶ 24 & Ex. Q.

---

[7] Indeed, even TM Equities' counsel confuse the fictional corporate distinctions. The Certificate of Service appended to the Motion identifies Lewis Brisbois Bisgaard and Smith as "Attorneys for Defendant Thompson Michie Associates Inc". However, until recently Thompson Michie Associates Inc. was the name of TM Equities. Lewis Brisbois represents Thompson Michie Associates LLC.

8

**OPPOSITION TO DEFENDANT TME'S MOTION TO DISMISS PURSUANT TO FRCP 12(B)(2) & 12(B)(6)**

**B.      The Court Also Has Specific Jurisdiction Over TM Equities.**

Plaintiffs agree that the *Schwarzenegger* three-part test applies to specific jurisdiction over TM Equities. Plaintiffs further embrace *Schwarzenegger* for the proposition stated *supra* that "[c]onflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor." *Id* at 800.

1.      <u>TM Equities Has Purposefully Directed Its Activities To Nevada.</u>

TM Equities' registration as a foreign corporation with a registered agent, Plaintiffs submit, is an act by which it purposefully avails itself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws. Even if it was not registered, TM Equities are advisors and beneficiaries (and parents to) Thompson Michie Associates,[8] a company that takes advantage of Nevada's Landlord-Tenant laws,[9] eviction proceedings and sheriffs. While TM Equities may not pay taxes in Nevada, it is likely involved in structuring tax-advantage positions for Thompson Michie and the ownership vehicles it manages. Nevada's laws, roads and building codes benefit and protect the unified Thompson Michie enterprise that includes TM Equities. TM Equities came to Nevada and bought properties. *See* Mariner Dec. at ¶¶ 13,14 and 17. TM Equities is likely receiving some kind of income or benefit from these properties. TM Equities' conduct connects it to this forum in a meaningful way. *See Walden v Fiore,* 134 S. Ct. 1115, 1122 (2014).

2.      <u>Ms. Cantu and Ms. Svinnings' Claims Relate To TM Equities' Forum-related Activities.</u>

TM Equities cites *Omeluk v. Langsten Slip & Batbyggeri A/S,* 52 F.3d 267 (9th Cir 1995) for the proposition that the second prong of the specific jurisdiction test is met when a plaintiff's complaint would not have happened but for the forum-related activities. For starters, TM Equities is the Manager (and perhaps Managing Member) of La Vie, LLC, which undoubtedly owns the apartment complex "La Vie" where Plaintiffs worked, managed of course by Thompson Michie Associates, LLC. *See* Mariner Dec. at ¶ 24 & Ex. Q.

/ / /

---

[8] Thompson Michie Associates, taken literally, means the associates of Roger H. Thompson and James R. Michie. The associates are their sons. They are the owners of TM Equities. A plain reading shows this ineffable connection.

[9] Roger H. Thompson executed a consent decree with Civil Rights Division of the US Department of Justice on behalf of Thompson Michie Associates Inc., which owned and managed one of the offending apartment complexes in Las Vegas Nevada. *See* Mariner Dec. at ¶ 27 & Ex. T.

9

**OPPOSITION TO DEFENDANT TME'S MOTION TO DISMISS PURSUANT TO FRCP 12(B)(2) & 12(B)(6)**

Note also that, in *Omeluk,* discovery and depositions were necessary to get to the point where this prong of the jurisdictional test could be decided. *Id* at 268. Without such depositions and discovery, Plaintiffs can only point to what is publicly available:

> TM Equities Inc. was formed in 1973 as Thompson Michie Associates, Inc. ("TMA") by Roger H. Thompson and James R. Michie. … Since approximately 1985, TMA and its principals, James R. Michie and Roger H. Thompson, have been acquiring multi-family apartment properties. Because TMA's principals came from a development background, TMA knows the challenges in owning properties. It also feels it has unique expertise in increasing equity values through sophisticated procedures and in the application of value-added techniques. TMA's goal in almost all instances is to find ways to increase the rental rates, net operating income, the net rentable area, or a possible change of use.[10]

Mariner Dec. at ¶ 6. This description provides the but-for causation required for the second prong of establishing specific jurisdiction. TM Equities' "sophisticated procedures" and "value added techniques" to "increase[e] net operating income" are the practices of which Ms. Svinning and Ms. Cantu complain. TM Equities' "value added techniques" may well be things like excluding bonuses from the regular rate of compensation for purposes of calculating overtime, or similarly excluding leasing discounts. It could well be terminating the employment of leasing specialists and assistant community managers who threated to increase costs and reducing net operating income by asking for the wages they are owed. But for TM Equities' paternal pressure to keep costs down and profits up, it could well be that managers would and could have responded to Plaintiffs' complaints, obviating the need for this lawsuit. In short, one corporation's "sophisticated procedure" to "increase profits" is another person's "wage theft": Nevada Labor Commissioner Shannon Chambers said wage theft cases – instances where a company tries to raise profits by forcing employees to work off the clock or not paying them for overtime work – have been on the rise in Nevada over the past four years.[11]

    3.    <u>Exercising Jurisdiction over TME Comports with Fair Play and Substantial Justice.</u>

TM Equities cites the *Core-Vent Corp v Nobel Indus*. 11 F3d 1482 (9th Cir. 1992) multi-part test for fair play and substantial justice, the third prong of specific jurisdiction. The test requires that TM Equities defend the claims against it here. Despite the protestations to the contrary, TM Equities has purposefully

---

[10] As an aside, the main reference to TM Equities as exactly the same as Thompson Michie Associates is equally applicable to Plaintiffs' alter ego and agency allegations.

[11] Mariner Dec. at 15 citing https://faircontracting.org/wage-theft-a-problem-across-industries-study-says-nv/ (2019)

interjected itself into Nevada's affairs, buying real estate, first being and then advising landlords on increasing profit margins. TM Equities would not be under any particular burden defending in the forum: indeed one Roger Thompson owns a home in Henderson, Nevada. *See* Mariner Dec. at ¶ 16 & Ex. I. Only Nevada's FLSA and labor laws are at issue, so no real conflict arises with the laws of Utah. Nevada has a palpable interest in deciding this case and Plaintiffs are Nevada residents and deserve the application of the law where they live and work. Fair play demands TM Equities be here, in Nevada, where it shaped its legacy and honed its techniques. Thus, all three prongs of specific jurisdiction are met.

   **C. TM Equities and Thompson Michie LLC Are Also Alter Egos or Agents of One Another.**

   Under Nevada law, the standard for the existence of an alter ego relationship are: (1) a corporation is influenced and governed by the alleged alter ego, (2) there is such unity of interest and ownership that one is inseparable from the other, and (3) adherence to the corporate fiction of a separatee entity would sanction fraud or promote a manifest injustice. *See LFC Mktg. Grp., Inc. v. Loomis,* 8 P.3d 841, 846-47 (Nev. 2000). Similarly, "[f]undamental tenets of agency theory require that an agent act on the principal's behalf and subject to the principal's control." *Williams v. Yamaha Motor Co,* 851 F.3d 1015, 1024 (9th Cir. 2017).

   TM Equities complains that Plaintiffs have not alleged any specific facts showing TM Equities is the alter ego of Thompson Michie Associates in the complaint. This is not the standard. When the parties have not had an opportunity to sufficiently develop the record so that the court can determine whether there exists an alter ego relationship, jurisdictional discovery is appropriate. *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1134-35 (9th Cir. 2003).

   In any event, Plaintiffs have stated facts in this Opposition from which the Court can easily see a unity of interest and ownership between TM Equities and Thompson Michie Associates. Their financing partner does not distinguish between them. Their corporate website narratives do not distinguish between them. The phrase "Thompson Michie Communities" does not distinguish between them. It would be hard to imagine that the fathers running TM Equities have no influence or governance over their sons, sitting in the same office. It is much easier to imagine that the fathers – who built this empire – set the policies and governance of Thompson Michie. TM Equities Inc. is not only the *de facto* parent corporation of Thompson Michie Associates, LLC, but TME's Thompson and Michie are quite literally the parents of TMA's Thompson and Michie.

   In short, Thompson Michie is unified, merged, and indistinct:

11

**OPPOSITION TO DEFENDANT TME'S MOTION TO DISMISS PURSUANT TO FRCP 12(B)(2) & 12(B)(6)**

- Roger H. Thompson, of TM Equities, is also the Chief Financial Officer of Thompson Michie Associates, LLC (Mariner Dec. at ¶ 28 & Ex. U);
- Roger E. Thompson and Trent S. Michie are both officers in TM Equities, along with Roger H. and James R. (*id.* at ¶ 19, Ex. L);
- A recent profile on Roger H. Thompson states that "Thompson is semi-retired now ***and his son and partner's son run TM Equities' day-to-day affairs***" (*id.* at ¶ 20 & Ex. M (emphasis added));
- The Better Business Bureau profile of Thompson Michie Associates, LLC states that it has been in business since 1973, which is when Thompson Michie Associates Inc. began, before becoming TM Equities Inc. (*id.* at ¶29, Ex. V); and
- The "About Us" section of www.ThompsonMichie.com is blank – even Thompson Michie can't decide whether it's TM Equities Inc., Thompson Michie Associates, LLC, or the original Thompson Michie Associates Inc. (*id.* at ¶ 10 & Ex. E).

When a court has jurisdiction over a business entity, the alter ego doctrine allows the court to exercise jurisdiction over that business entities' alter ego. *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1070-71 (9th Cir. 2015). It would be manifestly unjust for Mr. Thompson and Mr. Michie to be absolved from answering for the actions of Thompson Michie Associates.   At the time of filing Plaintiffs' Complaint, Thompson Michie Associates, LLC was in default status according to the Nevada Secretary of State, leaving TM Equities as the only viable (and perhaps) solvent Defendant to answer for Plaintiffs' claims.  *See* Mariner Dec. at ¶ 26 & Ex. S.  It would certainly promote a manifest injustice if Thompson Michie Associates, LLC was a mere shell of TM Equities without adequate capitalization.  How can Thompson Michie Associates, LLC be expected to pay employees for unpaid back overtime when it can't even stay current with the Nevada Secretary of State?

### D. Strictly in the Alternative, TM Equities' Motion Requires Jurisdictional Discovery.

The Court will decide whether the documents Plaintiffs Ms. Cantu and Ms. Svinning have submitted, through the Mariner Dec. filed herewith, sufficient facts demonstrating that TM Equities' closely run empire targets Nevada and its contacts are substantial, continuous and systematic, and that TM Equities is the alter ego of Thompson Michie Associates LLC.  If there is any doubt, however, Plaintiffs are due discovery. *See Alverson, Ltd. v. Nortek Inc.,* Case No. 2:15-cv-2141 (D. Nev. 2016) (advising jurisdictional discovery); *See*

12

*also In re Western States Whsle. Nat. Gas Antitrust Litig.,* MDL 1566, 2:06-CV-01351 (D. Nev. 2007) (granting jurisdictional discovery).

Discovery is needed, at minimum, on: (i) whether TM Equities is the *de facto* owner of properties in Nevada as the managing member of Delaware LLCs (*see* Motion at 3, n.2); (ii) resolving the apparent contradictions between Plaintiffs' evidence and Roger H. Thompson's declaration, including information omitted by his declaration; (iii) whether TM Equities can "fire" Thompson Michie Associates as manager of Thompson Michie apartment communities or otherwise dictate the terms, conditions, standards, or practices of how the apartment communities are run; (iv) the nature of the agreements and ownership interests between TM Equities and Thompson Michie Associates LLC; (v) the interrelationship between the two Thompsons and two Michies with respect to their roles as managers and officers in each other's "separate" companies; (vi) the nature and particulars of their office arrangements and interactions sharing the same corporate headquarters; and (vii) the qualifications and experience of the junior Thompson and Michie to run Thompson Michie Associates LLC without the guidance and advisement of their fathers, the senior Thompson and Michie. All four principals of TM Equities and Thompson Michie Associates, LLC should be deposed.

The declaration by Roger H. Thompson submitted in support of TM Equities' Motion is so deceptively simple as to be deceptively misleading. In *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018), the Ninth Circuit warned that "unscrupulous use of extrinsic documents to resolve competing theories against the [plaintiff's] complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery." *Id*. at 989. Here, only discovery will tell whether TM Equities may have succumbed to the temptation to provide an unscrupulous one-sided view of the facts.

**E.     Plaintiffs Class Allegations Are Well Supported and Specify an Identifiable Class.**

TME's argument that Plaintiffs' class allegations must be dismissed at this stage are little more than wishful thinking. As TME itself concedes, "Rule 23 is not a pleading standard." Motion at 13. The time to decide Plaintiffs' class claims will be after discovery when Plaintiffs' motion for class certification is filed. Already pending is Plaintiffs' motion for circulation of notice pursuant to 29 U.S.C. § 216(b), i.e., "conditional certification" of Plaintiffs' FLSA claim. *See* ECF No. 14 (hereinafter "Motion for Conditional Certification").

The cases on which TME relies are easily distinguishable. For example, unlike in *Jackson v Boehringer Ingelheim Phar. Inc.*, 2013 U.S. Dist. LEXIS 100726, at *12 (S.D. II. July 18, 2013), Plaintiffs'

13

**OPPOSITION TO DEFENDANT TME'S MOTION TO DISMISS PURSUANT TO FRCP 12(B)(2) & 12(B)(6)**

class allegations here do relate to a "specified class." *See* Complaint ¶ 72. Nor do Plaintiffs' class allegations "attempt to incorporate by reference the FLSA allegations." Motion at 13. Plaintiffs' class allegations are stand alone and self-contained. *See* Complaint at ¶¶ 78. Nor is there any issue here about whether Plaintiffs' class claims have merit. The laws of Nevada overtime are identical to the FLSA when it comes to regular rate calculations. For all the reasons set forth in Plaintiffs' Motion for Conditional Certification and accompanying evidence, it is indisputable that Plaintiffs and putative class members were not paid for all their overtime. *See* ECF Nos. 14, 14-1, 14-2, 14-3, 14-4 (incorporated herein by reference.) Hence, unlike in *Murphy v Directv, Inc.*, 2011 US Dist. LEXIS 87627, at *2 (C.D. Cal. Feb. 11, 2011), it is very clear that Plaintiffs' class claims *can* be maintained. TME makes no substantive argument to the contrary – just superficial, formulaic objections to the sufficiency of Plaintiffs' pleading.

Indeed, TME's Motion is riddled with accusations and case citations masked as legal argument. TME invokes "*Iqbal-Twombly*" as if it were some kind of magical phrase with the power to ward off any cause of action that Defendants do not like. For instance, TME denies the plausibility of Plaintiffs' overtime allegations even though the Complaint specifies that Thompson Michie ***admitted*** underpayment of overtime. See Complaint at ¶¶ 44, 63. If TME truly wishes, Plaintiffs will be happy to amend their Complaint and specify every single workweek in which they worked over 40 hours. Such detail is already contained in Plaintiffs' Motion for Conditional Certification. *See* ECF Nos. 14 & 14-2. TME's carping about "typicality" is similarly misguided. Ms. Cantu and Ms. Svinning are typical class members because they were both – along with all other hourly employees – subject to the same common (albeit illegal) overtime policy and practice of Defendants. Hence it iss not conclusory to allege that "Plaintiffs' claims are typical of the claims of Class Members" because ***that is true*** and predicated on earlier allegations that TME ignores.

Nor is this case about Ms. Cantu's individual leasing discount. To be sure, Defendants' pigheaded denial of a renewal discount to Ms. Cantu is what kickstarted this case, but that just opened Ms. Cantu's eyes to Defendants' other illegal practices. Ms. Cantu's renewal discount has nothing to do with this case anymore – although Defendants probably wish it did. This case is now about ***any housing discount*** that Thompson Michie failed to include in the regular rate of pay for purposes of paying overtime. (*See* Complaint at ¶¶ 29-31 & 61 (predicating class claim on "Housing Discount" as distinguished from Ms. Cantu's "Leasing Discount").) Regardless, to the extent any subdivision needs to be made between class members who received

Housing Discounts and those who did not, the remedy is subclassing members – not dismissing Plaintiffs' class claims.  As TME is well aware, subclasses are a common feature of class actions.

### F.  Not Only Do Plaintiffs' Wage Claims Not Fail, But Defendants Are Indisputably Liable.

TME better hope its jurisdictional argument is a winner because it apparently has no answer for Plaintiffs' class and collective action claims.  Even if Plaintiffs' first three causes of action somehow failed to state a claim– which is preposterous—TME's call for immediate and irrevocable "dismissal" would be better couched as a motion for more definite statement pursuant to FRCP 12(e).  But look, this ain't rocket science.  Defendants' violations of the FLSA and Nevada wage laws are as plain as the black-and-white print on each of their employee's paychecks – especially the printed overtime rate.  TME should save its breath for summary judgment because that's where this case is heading – not dismissal at the pleading stage.

TME basically wants to know, for the past two years:  (i) what each Plaintiff was normally paid, (ii) what hours each normally worked, and (iii) when each Plaintiff *specifically* worked overtime.  First, Plaintiffs submit that all this information is readily available to TME merely by asking their sons and office suitemates – that is, if they can somehow penetrate the Chinese Wall that surely separates the senior "T" and "M" of TME from the junior "T" and "M" of TMA.  (*See generally* sections I & II, *supra*.)  Second, the burden of keeping and preserving records of wages, hours, and other practices of employment falls squarely on the employer, so perhaps they should look in the mirror.  *See* 29 U.S.C. § 211(c).  Third, all these wage-and-hour details and more are contained in Plaintiffs' Motion for Certification and the supporting declaration and exhibits.  (*See* ECF Nos. 14 and 14-2.)  The only question now is – since TME is so intensely interested in this information and finally has it – when are they going to pay Plaintiffs.  Hopefully TME will clear that up in its reply.  We would hate to think that TME is merely raising these questions as a litigation tactic without any sincere interest in the answers, or any corresponding solutions to fixing years of miscalculated overtime.

Finally, TME misrepresent the specificity of Plaintiffs' Complaint when it argues that "Plaintiffs merely allege that there exist 'various wage-and-hour violations, including Defendants' failure to include Bonus Pay and Housing Discounts in Ms. Cantu's regular rate of pay for purposes of paying overtime.'" Motion at 15.  That's not what Plaintiffs "merely" allege and TME knows it. The "allegations" quoted by TME are a description of Plaintiffs' wage demand letter.  Complaint at ¶42.  Those are not actual or "mere" allegations in Plaintiffs' Complaint.   After playing dumb about some guys named Roger E. Thompson and



RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS

Trent S. Michie who "appear to be" the managers of TMA (Motion at 4, *l.*5), TME is now playing dumb with Plaintiffs' claims.

### G.  Ms. Svinning States a Claim for Retaliation under Nevada Law.

Contrary to the heading of TME's argument, Ms. Svinning alleges no violation for FLSA retaliation. Her only retaliation claim is pursuant to NRS Chapter 613 (i.e., Nevada's EEO laws).  *Compare* Complaint's Fourth Cause of Action (on behalf of each Plaintiff) *with* Fifth Cause of Action (on behalf of Ms. Cantu).  So that's one win for TME – they don't have to deal with Ms. Svinning's imaginary FLSA retaliation claim.  The attack on Ms. Svinning's other retaliation claim – the real one – does not fare so well.

Quoting NRS 613.330(1)(c), Plaintiffs' Fourth Cause of Action states  "it is an unlawful employment practice for an employer…to discriminate against any employee because the employee has ***inquired about, discussed or voluntarily disclosed his or her wages or the wages of another employee***."  *See* Complaint at ¶ 100 (emphasis added).  Furthermore, "[i]t is an unlawful employment practice for an employer to discriminate against any of his or her employees…because the employee, applicant, person or member, as applicable, ***has opposed any practice made an unlawful employment practice by NRS [613.330(1)(c)]***…or because he or she has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under NRS [613.330(1)(c)]."  NRS 613.340(1) (emphasis added), *quoted in* Complaint at ¶ 100.

As Plaintiffs' Complaint makes clear, it is the first part of these statutory provisions (NRS 613.330(1)(c)) that apply to Ms. Cantu's retaliation claim and the second part (NRS 613.340(1)) that applies to Ms. Svinning's retaliation claim. See Complaint at ¶ 101.  TME's argument, however, only cites and relies on the ***unbolded*** part of NRS 613.340(1) (quoted above) with respect to Ms. Svinning.  *See* Motion at 14 (limiting Svinning's retaliation claim to "personally" making a charge, testifying, assisting, or participating in an "investigation, proceeding, or hearing").  TME thus breezes past the whole first part of Svinning's legal cause of action, which is the much more broadly worded "oppos[ing] any practice made an unlawful employment practice."  *See* NRS 613.340(1).  Defendant's argument is thus incomplete and disingenuous because Defendant nowhere grapples with the true nature of Ms. Svinning's claim and its predicate statute.

TME's artificially technical argument also ignores the Nevada Supreme Court's proclamation that "the Nevada anti-discrimination statutes have laudable goals and will be broadly construed. . .." *Palmer v. State Gaming Control Board*, 106 Nev. 151, 154 (Nev. 1990) (quotations omitted).  Here, because Ms. Cantu was

16

**OPPOSITION TO DEFENDANT TME'S MOTION TO DISMISS PURSUANT TO FRCP 12(B)(2) & 12(B)(6)**

already pursuing unpaid wages, and Ms. Svinning "assisted" in that investigation,  TME is splitting hairs to argue that the ensuing retaliation against Ms. Svinning (termination) does not fall within the legislative ambit of NRS 613.340(1).  Regardless, Ms. Svinning clearly "opposed" the retaliation against Ms. Cantu (for inquiring about her wages), which clearly falls under the second part of the statutory definition – that TME conveniently ignores.  *See* NRS 613.340(1).

This episode perfectly demonstrates how, even when causes of action are specifically alleged – such as ***directly quoting the statute*** – TME will still find fault with Plaintiffs' allegations.  The issue here is not Plaintiffs' allegations, the issue is TME's win-at-all-costs, throw-rice-against-the-wall litigation tactics despite – or perhaps because of – being caught red handed.  Besides, even if TME was correct that Ms. Svinning cannot state a claim for retaliation, TME would necessarily lose its next argument…

**H. Regardless Whether Ms. Svinning Has an Adequate Statutory Remedy, Plaintiffs Are Entitled to Plead Alternative Theories of Recovery.**

TME's next argument is that Ms. Svinning cannot maintain a cause of action for tortious discharge in violation of public policy because she already has an adequate statutory remedy for retaliatiory discharge under NRS Chapter 613.  What?  Didn't TME just argue that Ms. Svinning had no adequate statutory remedy for retaliation?  TME's Motion is seemingly at war with itself.

Unless TME is right here, right now willing to concede either one of Ms. Svinning's causes of action – her Fourth or Sixth – it cannot force Plaintiff to abandon alternate theories of recovery at the pleading stage. *See* FRCP 8(d)(2); *Cooper v. Eighth Judicial Dist. Court*, No. 74907, at *5 (Nev. App. June 18, 2018). Regardless, the analysis is not so cut-and-dried as whether an adequate statutory remedy exists.

In *Sands Regent v. Valgardson*, 777 P.2d 898 (Nev. 1989), the Nevada Supreme Court disallowed a tortious discharge claim based on age discrimination where the plaintiff had ***already recovered*** statutory damages for age discrimination pursuant to the ADEA.  *See id*. at 899.  Under those circumstances "it was unfair to a defendant to allow additional tort remedies."  *See* Motion at 11, *ll*.6-7 (quoting *Ozawa v. Vision Airlines*, 216 P.3d 788, 791 (Nev. 2009)).  Here Ms. Svinning does not seek additional or double tort remedies, but she is entitled to recover her total losses (plus any punitive damages assessed) under at least one of her theories.  At this stage – where TME is not even conceding jurisdiction – it would severely prejudice Ms. Svinning to dismiss any one of her claims before discovery.  (Of course, it is also highly ironic that TME gets

17
**OPPOSITION TO DEFENDANT TME'S MOTION TO DISMISS PURSUANT TO FRCP 12(B)(2) & 12(B)(6)**

to pursue two completely *contradictory* courses of action: challenging jurisdiction while seeking the affirmative relief of dismissing Plaintiffs' Complaint.)

Furthermore, the Nevada Supreme Court's holding in *Sands* was explicitly limited to the particular age discrimination claims at issue in that case, "conclud[ing] that age discrimination, as objectionable as it may be, does not rise to the same level as the actionable tortious conduct found in [other cases]." *See* 777 P.2d at 892; *see also id.* ("[W]e do not perceive that our public policy against age discrimination is sufficiently strong and compelling to warrant another exception to the 'at-will' employment doctrine."). The outcome might be different if the public policies involved were withholding employees' wages or retaliation against those who seek payment of unpaid wages or, as here, retaliation against those who oppose unlawful workplace retaliation. *See* NRS 613.340(1).

### I. TME's Identical Argument against Ms. Cantu's Constructive Discharge Claim Fails for the Same Reason.

TME's final argument is an exact replica of the previous one, except it is directed at Ms. Cantu's constructive discharge claim. *See* Motion at 18. For the same reasons articulated above, this version of TME's argument also fails. Additionally, Ms. Cantu's constructive discharge claim is not based entirely on the public policies against retaliation for protected wage-related activity. Ms. Cantu's intolerable work conditions were also created by "the wrongful termination of her work ally Ms. Svinning, the eviction ultimatum to Ms. Cantu and her fiancé, and Defendants' compulsory transfer of Ms. Cantu to a new Thompson Michie property without any legitimate business reason." Complaint at ¶ 124. Therefore, in the event the Court is inclined to dismiss Ms. Cantu's constructive discharge claim on the basis of an adequate statutory remedy under the FLSA or Nevada's EEO laws, Plaintiffs respectfully request leave to amend so that the public policies against Thompson Michie's other abhorrent work conditions may be fleshed out.

### V.

### CONCLUSION

For all the foregoing reasons, Defendant TM Equities' Motion must be denied in its entirety. Strictly in the alternative, to the extent the Court is inclined to reject jurisdiction over Defendant, Plaintiffs request a brief stay to conduct jurisdictional discovery. Finally, to the extent the Court is inclined to grant any other of Defendant's requested relief, Plaintiffs respectfully request leave to amend their Complaint in order to cure

any perceived deficiencies.

                              Respectfully submitted,

DATED: June 19, 2024        **RAFII & ASSOCIATES, P.C.**

                              By: **/s/ Jason Kuller**
                              JASON KULLER
                              Of Counsel
                              *Attorneys for Plaintiffs*

**OPPOSITION TO DEFENDANT TME'S MOTION TO DISMISS PURSUANT TO FRCP 12(B)(2) & 12(B)(6)**

**CERTIFICATE OF SERVICE**

I hereby certify that, on the date shown file stamped on this pleading, I served a copy of the foregoing pleading via electronic service in accordance with the Court's order and Local Rules and that it was served on all parties registered with the Court's CM/ECF system of electronic service.

_____
JASON KULLER